People v Wheeler (2022 NY Slip Op 01485)





People v Wheeler


2022 NY Slip Op 01485


Decided on March 10, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:March 10, 2022

112078
[*1]The People of the State of New York, Respondent,
v
Shawn M. Wheeler, Appellant.

Calendar Date:January 10, 2022

Before:Egan Jr., J.P., Clark, Pritzker and Colangelo, JJ.

Buzzetti Law Office, Elmira (Matthew Buzzetti of counsel), for appellant.
Joseph G. Fazzary, District Attorney, Watkins Glen (John C. Tunney of counsel), for respondent.



Clark, J.
Appeal from a judgment of the County Court of Schuyler County (Morris, J.), rendered February 21, 2019, convicting defendant following a nonjury trial of the crimes of criminal sexual act in the second degree and sexual abuse in the third degree (three counts).
Following allegations that he subjected a 13-year-old female family member (hereinafter the victim) to certain sexual contact while putting her to bed one evening, defendant was charged with one count of criminal sexual act in the second degree, one count of attempted rape in the second degree and three counts of sexual abuse in the third degree. Following a nonjury trial, defendant was acquitted of attempted rape but otherwise convicted as charged. He was then sentenced to four months of intermittent incarceration on each conviction, to be served concurrently, and 10 years of probation. He appeals.
We initially reject defendant's contention that the verdict is against the weight of the evidence. "When conducting a weight of the evidence review, this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Cummings, 188 AD3d 1449, 1450 [2020] [internal quotation marks and citations omitted], lv denied 36 NY3d 1096 [2021]; see People v Bleakley, 69 NY2d 490, 495 [1987]; see also People v Lane, 7 NY3d 888, 890 [2006]). As limited by their indictment and bill of particulars, the People were required to establish that defendant, being at least 18 years old, engaged in oral sexual conduct with the victim when she was less than 15 years old (see Penal Law § 130.45 [1]) and subjected her to three instances of sexual contact without her consent, to wit, by touching her breasts and genital area and having her touch his penis (see Penal Law § 130.55).
During the relevant time period, the victim was 13 years old. The evidence reveals that she has a seizure disorder and suffered a stroke as an infant, resulting in weakness on her right side, including difficulty using her right arm. She was also diagnosed with certain cognitive deficits, and she was described by various witnesses as having the abilities of an 8 to 11 year old. The victim's mother (hereinafter the mother) lives with defendant, age 32 at the time of the incident, and the victim lives with them and three other children part time. The subject incident occurred over the weekend of August 13, 2017 when defendant was putting the victim and the other children to bed. All agree that this was more often the mother's task, if anyone were to tuck the children in at all, but she was tired that evening. According to the testimony of the victim and one of the female children living in the house (hereinafter the young female relative), they said goodnight to the mother and defendant downstairs[*2], but defendant then offered to come upstairs to tuck them in. The mother then readied herself for bed and, at some point, fell asleep.
Meanwhile, defendant went upstairs. The entirety of the second level of the house is comprised of two bedrooms and a small landing, or hallway, in between. The victim shares one of those rooms with the young female relative, and a young male child sleeps in the other bedroom.[FN1] Neither bedroom had doors during the relevant time. The girls' beds were set up on opposite sides of their bedroom, described as being somewhere between 8 and 14 feet apart and separated by a large dresser. According to the girls, they had already gotten into their pajamas and were lying in their beds when defendant got to their room; the victim made clear that the weakness in her right arm does not prevent her from getting changed into her pajamas on her own. Both girls also testified that the lights in their bedroom were off and they could not see because it was "dark" or "very dark." The victim recalled that the hallway light was also off, and all agreed that this light was "always," or at least ordinarily, left on as a nightlight for the children. The mother also testified that, ordinarily, the bedroom light would be turned off as the parent tucking in the children walked out of the room, not before. Defendant tucked the young female relative in first and then went to the victim's bed.
According to the victim, defendant then sat on her bed, moved her closer to the wall and removed her tank top, bra, shorts and panties. She described that he then "rubbed" her "chest" and her "private part," clarifying upon further questioning that she meant her breasts and vagina, respectively. She testified that he also wanted her to put his "pee-pee," meaning penis, in her mouth, which she did. He also wanted her to "squeeze" his penis, which she also did. Defendant next stated that he wanted her to get on top of him and, in his words, "try something new." The victim testified that she told defendant that what he was doing was "weird," and he in turn asked her why it was weird; when she repeated herself, he stopped. She clarified that the foregoing act involved defendant's penis and her vagina, but she was unsure if his penis went inside of her vagina "because it was dark." The victim testified that she called out "help" to the young female relative several times during the incident at a "loud" volume in hopes that she would go get the mother, but that did not happen.[FN2] Defendant then put the victim's clothes back on, exited the room, turned the hallway light on and went back downstairs.
According to the mother, when defendant ultimately came back downstairs, she "was asleep but awake enough that [she heard] him coming through the door into the bedroom." He then made a near immediate request of the mother for sex in a manner she described as not unusual. She generally agreed that it felt like defendant was upstairs for an unusually [*3]long time, given that tucking in the children was a quick process for her and she was ultimately unable to stay awake the entire time he was upstairs. She also testified, however, that she was "[n]ot completely" asleep the entire time that defendant was upstairs and, via a heating vent, she was able to hear typical bedtime commotion that settled thereafter. The heating vent is located in the ceiling of a closet located next to her and defendant's downstairs bedroom, and it connects to a vent on the landing at the top of the stairs. She stated that they tended to keep those closet doors open and the heating vent was regularly used to listen in on the children while they are upstairs. She testified that, on prior occasions, she had been able to hear the children whispering when they were supposed to be in bed asleep. The victim's mother asserted that, while defendant was upstairs on the night in question, she did not hear anything like the statements allegedly made by defendant or the victim.
According to the young female relative, who was nine years old at the time of trial, defendant took what "seemed like a normal amount of time" putting the girls to bed on the night in question. She testified that, while defendant was tucking in the victim, she heard the victim "laughing and that's all." The young female relative further recalled that the victim said "help" while she was being tucked in, which made the young female relative "[j]ust a little bit" concerned because she "couldn't really tell" if the victim was okay. The young female relative testified that she tried to go to the victim, but defendant repeatedly directed her to go back to her own bed. She did not hear defendant state anything else while he was in the girls' bedroom, but she had also fallen asleep by the time defendant exited.
The victim disclosed the incident to her mother in the days that followed. According to the mother, the victim told her that defendant touched her "inappropriately the other day." When asked what she was talking about, the victim stated, "[T]he other day he touched me when he was tucking me in."[FN3] Immediately following the victim's disclosure, the mother called defendant to come home from work stating only that the victim had made allegations against him. Upon prompting by another friend, who happened to also be a mandated reporter, the victim's mother then called the police, who were there by the time defendant arrived home. A sexual assault examination was performed shortly thereafter, and the victim's report to the sexual assault nurse examiner was consistent with her trial testimony. No visible physical injuries or DNA were present, which was also consistent with the sexual acts the victim described and the fact that she had since showered.
In arguing that the verdict is against the weight of the evidence, defendant takes issue with the sometimes leading questions posed by the People to the victim, an alleged lack of corroboration of her [*4]version of events and the absence of any scientific evidence demonstrating that any sexual abuse had occurred. Because the proof relies heavily on the testimony of the victim and the young female relative, a different verdict would not have been unreasonable here (see People v Jackson, 176 AD3d 1312, 1312 [2019]). However, when we view the evidence in a neutral light and defer to County Court's credibility determinations, particularly its decision to credit the victim after having had the opportunity to hear her testimony and observe her demeanor (see People v Madsen, 168 AD3d 1134, 1137 [2019]), we find that the verdict convicting defendant of criminal sexual act in the second degree and the three counts of sexual abuse in the third degree to be supported by the weight of the evidence (see Penal Law §§ 130.45 [1]; 130.55; People v Cummings, 188 AD3d at 1453).
Turning to defendant's evidentiary arguments, he first contends that County Court erred by "allowing the People to cross[-]examine [the mother] on [their] case-in-chief." Both he and the People go on to conflate the examination of a hostile witness via leading questions, which is a matter of discretion, with the impeachment of a party's own witness via a prior contradictory statement, which is regulated by CPL 60.35 (see People v Rivera, 130 AD3d 487, 488 [2015], lv denied 26 NY3d 971 [2015]). We construe defendant's argument as statutory,[FN4] and CPL 60.35 permits the impeachment of a witness in a criminal trial by the party who called him or her via the use of his or her prior contradictory statement so long as that witness's trial testimony is on a material issue and "tends to disprove the position of such party" (CPL 60.35 [1]) — in other words, where the trial testimony "affirmatively damages the case of the party calling [the witness]" (People v Fitzpatrick, 40 NY2d 44, 51 [1976] [emphasis omitted]).
To the extent that defendant's argument is preserved, it involves the mother's direct testimony as follows: "That evening when it was time to go to bed, I went into my room to get myself ready for bed and [defendant] went upstairs to tuck [the] children in. And I was very tired, so I laid in my bed and was indeed in and out of sleep a little bit here and there while I waited for [defendant] to return back to the bedroom. . . . During [the] time that he was gone there was hustle and bustle upstairs. I did hear conversation. I did hear my son's dog going crazy in his kennel. I heard a lot of different commotion that kept me from going into a sound sleep. And shortly after [defendant] went upstairs the hustle and bustle did stop and became quiet. And then [defendant] did return downstairs after that." The People asked thereafter, "When he went upstairs to tuck in the children, did you fall asleep?" The mother stated, "Not completely," and, when asked if she was "certain of that," she unequivocally stated that she was. However, during the grand jury proceeding, the mother testified [*5]that "at some point in time [she] did fall asleep until [defendant] came back down." In our view, the foregoing statements are contradictory, and the mother's impeachment was proper.[FN5]
Although the distinction between the mother's statements may seem slight, according to her grand jury testimony, she had fallen asleep, with no qualification as to the depth of that sleep, before defendant made it back downstairs. She was therefore logically asleep for some period of time prior to his return, and the victim's testimony suggests that a number of the remarks made by defendant and herself were exchanged toward the end of the subject incident. If the victim's mother was more or less awake at that time and thus still able to listen through the heating vent, allegedly capable of transmitting mere whispers, a finder of fact could draw very different inferences. Essentially, the mother, by way of her trial testimony, attempted to make herself an auditory witness to the subject incident, and she ultimately testified that she heard nothing that would support the victim's testimony as to what was said in the girls' bedroom. What transpired in that room is material, and, in context, the mother's trial testimony was exculpatory and thus "affirmatively damaging to the People's case and not merely neutral or unhelpful" (People v Hampton, 73 AD3d 442, 443 [2010], lv denied 16 NY3d 895 [2011]; see People v Cade, 73 NY2d 904, 905 [1989]; People v Perez, 272 AD2d 86, 86 [2000], lv denied 95 NY2d 837 [2000]; People v Mattison, 97 AD2d 621, 623 [1983]; People v Boodrow, 90 AD2d 944, 945 [1982]; see generally Proposed New York Criminal Procedure Law § 30.50, p 70, Staff Comment of the Commission on Revision of the Criminal Code [McKinney's Pamphlet, 1967]). There was therefore no violation of CPL 60.35 (1).
Defendant's remaining arguments warrant limited discussion. His contention that County Court erred when it allowed the People to ask the victim and the young female relative leading questions is unavailing given the nature of the subject offenses, the ages of the witnesses and the victim's cognitive disability (see People v Owens, 149 AD3d 1561, 1562 [2017], lv denied 30 NY3d 982 [2017]; People v Boyd, 50 AD3d 1578, 1578 [2008], lv denied 11 NY3d 785 [2008]; People v Adams, 272 AD2d 967, 967-968 [2000], lv denied 95 NY2d 863 [2000]; People v Williams, 242 AD2d 469, 469 [1997], lv denied 91 NY2d 883 [1997]). Defendant's claim that he was erroneously denied the opportunity to cross-examine the victim as to her allegedly inconsistent grand jury testimony is meritless. We have reviewed the grand jury minutes, and her trial testimony was not in fact inconsistent. His argument concerning the People's interaction with the victim over a lunch break is unpreserved and unpersuasive.
Defendant next contends that County Court's failure to inquire into his decision not to testify is reversible error. Assuming that defendant was not required to preserve that contention [*6]for our review (see People v Pilato, 145 AD3d 1593, 1595 [2016], lv denied 29 NY3d 951 [2017]), under these circumstances, the court was not obligated to ascertain if defendant's failure to testify was a voluntary and intelligent waiver of his right (see People v Madigan, 169 AD3d 1467, 1468-1469 [2019], lv denied 33 NY3d 1033 [2019]; People v Dolan, 2 AD3d 745, 746 [2003], lv denied 2 NY3d 798 [2004]; compare People v Morgan, 149 AD3d 1148, 1152-1154 [2017]; People v Robles, 115 AD3d 30, 33-36 [2014], lv denied 22 NY3d 1202 [2014]).
Finally, defendant has failed to meet his burden on his ineffective assistance of counsel claim (see People v Bowen, 185 AD3d 1219, 1221 [2020]; People v Izzo, 104 AD3d 964, 967 [2013], lv denied 21 NY3d 1005 [2013]). The record instead reveals that defense counsel made appropriate motions, made cogent opening and closing statements, effectively cross-examined witnesses, interjected a multitude of appropriate objections, presented evidence in support of defendant and obtained an acquittal on the most serious offense charged.
Egan Jr., J.P., Pritzker and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: The third child sleeps in a room downstairs.

Footnote 2: On cross-examination, defense counsel asked the victim to replicate her volume, and County Court noted for the record that she spoke in a "soft fashion" that could be heard from about 15 feet away.

Footnote 3: One of the mother's friends who was present at the time of disclosure testified on behalf of defendant and stated that the victim did not identify defendant by name at that time.

Footnote 4: To the extent that defendant does challenge County Court's decision to permit the People to treat the mother as a hostile witness, where a witness responds to questions in a reluctant manner, it is within the court's discretion to permit that witness to be led, and we cannot say that County Court abused that discretion here (see generally People v Rivera, 130 AD3d at 488).

Footnote 5: Although we are aware that the People maintained at trial that they were merely refreshing the mother's recollection with her grand jury testimony, what transpired can only be described as impeachment. Indeed, the People suggested in their summation that the mother was not being truthful about being asleep, or "tr[ying] to gin it up as I'm kind of in that gloaming of maybe I'm awake, maybe not awake."