People v Moore (2024 NY Slip Op 00337)

People v Moore

2024 NY Slip Op 00337

Decided on January 25, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 25, 2024

110698 CR-22-2149
[*1]The People of the State of New York, Respondent,
v
Kyshaan Moore, Appellant.

Calendar Date:November 13, 2023

Before:Lynch, J.P., Clark, Ceresia, Fisher and Mackey, JJ.

Paul J. Connolly, Delmar, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Mackey, J.
Appeals (1) from a judgment of the County Court of Schenectady County (Matthew J. Sypniewski, J.), rendered July 30, 2018, upon a verdict convicting defendant of the crimes of murder in the second degree, conspiracy in the second degree and criminal possession of a weapon in the second degree (two counts), and (2) by permission, from an order of said court, entered November 21, 2022, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
On the morning of November 19, 2016, Charles Dembrosky (hereinafter the victim) was found dead outside his apartment from an apparent gunshot wound to his neck. The
police soon learned that codefendant Tarchand Lall had been with the victim on the night that he was killed and they promptly interviewed him. Later, it was discovered that Lall was the sole beneficiary on a $150,000 life insurance policy that he had recently taken out on the victim. The victim's cell phone, which was recovered from the scene, revealed that the last three phone calls he had received on the night of his death were from (484) 447-XXXX, a number that was later linked to codefendant Joevany Luna (hereinafter the codefendant). Following an extensive investigation, defendant, Lall and the codefendant were arrested and jointly indicted, as is relevant here, for the crimes of murder in the first degree, conspiracy in the second degree and two counts of criminal possession of a weapon in the second degree as part of a murder-for-hire scheme. Broadly stated, the People theorized that Lall hired the codefendant to kill the victim in order to collect the proceeds from the victim's life insurance and defendant acted in concert with the codefendant to carry out the plan. Following a 13-day joint jury trial with the codefendant, defendant was acquitted of murder in the first degree but convicted of murder in the second degree, conspiracy in the second degree and two counts of criminal possession of a weapon in the second degree.[FN1]
He was subsequently sentenced, as a second felony offender, to a prison term of 25 years to life for his conviction of murder in the second degree, a concurrent prison term of 12½ to 25 years for his conviction of conspiracy in the second degree and prison terms of 15 years, to be followed by five years of postrelease supervision, for each count of criminal possession of a weapon. The court directed that the sentences on the two counts of criminal possession of a weapon run concurrent to one another, but consecutive to the murder sentence. Thereafter, defendant moved pursuant to CPL 440.10 to vacate the judgment of conviction based on the ground of ineffective assistance of counsel, which County Court denied without a hearing. Defendant appeals from the judgment of conviction and, by permission, from the denial of his CPL 440.10 motion.
Initially, defendant argues that the jury verdict is not supported by legally sufficient evidence and is also against the weight of [*2]the evidence.[FN2]
 "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Warner, 194 AD3d 1098, 1099 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1030 [2021]; see People v Agan, 207 AD3d 861, 862 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]). "When undertaking a weight of the evidence review, [this Court] must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then [it must] weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence. When conducting this review, [this Court] consider[s] the evidence in a neutral light and defer[s] to the jury's credibility assessments" (People v Terry, 196 AD3d 840, 841 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1030 [2021]). "Notably, we do not distinguish between direct or circumstantial evidence in conducting a legal sufficiency and/or weight of the evidence review" (People v Truitt, 213 AD3d 1145, 1147 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1144 [2023]; see People v Rivera, 212 AD3d 942, 944 [3d Dept 2023], lv denied 39 NY3d 1113 [2023]).
As charged here, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). Murder in the second degree is a class A-1 felony (see Penal Law § 125.25). "A person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he [or she] agrees with one or more persons to engage in or cause the performance of such conduct" (Penal Law § 105.15). As relevant to count 3 of the indictment, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]). With respect to count 4, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm" outside of their home or place of business (Penal Law § 265.03 [3]).
At trial, the People's case primarily relied upon cell phone records, video surveillance, audio recordings, witness testimony and the autopsy report, which established that the victim sustained a fatal gunshot wound to his neck. The evidence showed [*3]that on November 19, 2016, at approximately 7:00 a.m., the victim's roommate found the victim's body lying outside their apartment in the City of Schenectady. He and the victim had gone to a party together the night before, but the roommate left the party early and slept at his mother's house. After leaving the party, the roommate called the victim, who told him that Lall would drive him home. Lall was a local contractor who occasionally employed both the victim and the roommate for light construction and remodeling work. When the roommate returned to their apartment the following morning, he discovered the victim's body and immediately asked the upstairs neighbor to call 911. The upstairs neighbor testified that at 9:00 or 10:00 p.m. on the night of the murder, the victim had visited his apartment to use his phone, stating that he had forgotten his phone in Lall's van when he was dropped off. About 30 minutes later, Lall returned the victim's phone, after which the upstairs neighbor and the victim spoke for another 30 minutes, then both returned to their respective apartments. Between 1:00 and 1:30 a.m. on November 19, 2016, while watching television in his apartment, a neighbor who resided two or three houses away from the victim's apartment heard a gunshot-like sound. Another witness living about ¼ block from the victim's apartment testified that she was awakened by a loud gunshot-like sound at about 1:28 a.m.
Paramedics and firefighters with the City of Schenectady Fire Department responded to the scene and found the victim lying on his back with a fatal gunshot wound to his neck. Law enforcement from the City of Schenectady Police Department canvassed the area for physical evidence and found a shell casing from a semiautomatic weapon near the victim's body and the victim's cell phone in his pocket.[FN3] There was no DNA evidence found at the scene and the firearm was never recovered. Data extracted from the victim's phone revealed that between 12:57 and 1:22 a.m. on the night of the murder, the victim received three calls from cell phone number (484) 447-XXXX. No contact name was associated with that number in the victim's phone. Investigating officers suspected that the owner of that phone might have lured the victim outside with the intention of shooting him.
On the day of the shooting, Lall was interviewed by law enforcement and agreed to allow the police to download the contents of his phone, and a cell phone extraction report was created. That report revealed that Lall had also received a call from the (484) 447-XXXX phone, on October 29, 2016. The report further revealed text messages from Lall to an insurance agent from Primerica Financial Services, asking if a life insurance policy for "Chuck" was still in effect. A Primerica Financial Services employee later confirmed at trial that, in May 2016, Lall had taken out a $150,000 life insurance policy on the victim, naming himself as the sole beneficiary.[FN4] Testimony at trial indicated that Lall [*4]and the victim had falsely certified to the insurance company that they were domestic partners, thereby allowing Lall to take out the policy. The insurance agent who had issued the policy testified that in the months leading up to the victim's death, Lall contacted him several times to ask if the policy was "still in force." He testified that Lall last contacted him on November 21, 2016 to report that the victim had died and that he wanted to collect the benefit. Lall's bank records illustrated direct withdrawals to the life insurance company to pay the premiums and also revealed that he withdrew $5,000 in cash from his account on November 10, 2016 and another $5,000 a week later.
As part of the investigation, law enforcement subpoenaed records associated with phone number (484) 447-XXXX from T-Mobile, wherein they sought to obtain current subscriber information, call detail records and cell site information concerning the mobile device. T-Mobile provided the requested information, which included a call detail log based on cell phone use between August 22, 2016 and December 21, 2016. From that log, it was discovered that phone number (484) 447-XXXX and phone number (215) 758-XXXX communicated repeatedly between 12:30 and 7:09 p.m. on the evening of the murder, after which all communications between the two ceased. Through investigation, detectives ultimately discovered that (484) 447-XXXX belonged to the codefendant and (215) 758-XXXX belonged to defendant.[FN5]
Cell site information reports of defendant's and the codefendant's phones revealed that at approximately 7:00 p.m. on November 18, 2016, both phones were in the Wilmington, Delaware area, and then beginning at 7:18 p.m. both phones began connecting to the same or nearby cell towers at the same or similar times, indicating that the two met up together shortly after 7:18 p.m., and thereafter travelled in tandem from Wilmington, Delaware through New Jersey and into New York. An investigator testified that both phones accessed cell towers that covered the area of the murder scene minutes prior to the approximate time of the shooting. The last calls from the codefendant's phone were made in Schenectady and it was thereafter turned off and never used again. Defendant's phone, however, remained active and cell tower data demonstrated that defendant's phone utilized cell towers in the Wilmington area early in the morning on November 19, indicating that the phone had returned to Delaware. Between August 2016 and December 2016, the only time either cell phone utilized cell phone towers in Schenectady was the night of the murder.
After learning the pattern of travel of the cell phones, investigators used a license plate reader to determine whether any vehicles on the New York State Thruway made a round trip from Wilmington to Schenectady on the night of November 18 and the early morning of November 19. Investigators determined such a trip had been made by only one vehicle — a red sedan which law enforcement [*5]determined was registered to defendant's then-girlfriend. Law enforcement officials examined video surveillance footage collected from multiple cameras located around Schenectady. Footage near Lall's residence revealed that a red sedan approached Lall's residence at approximately 12:15 a.m. on November 19 and stayed for about 15 minutes. During that time, two individuals could be seen in the front seat of the vehicle and a third individual, identified at trial as Lall, was captured walking away from it. The vehicle drove away from Lall's residence at approximately 12:33 a.m. and, from surveillance video, investigators were able to track it as it drove toward the victim's neighborhood. After 12:37 a.m., the vehicle could no longer be located on any surveillance footage. Not long thereafter a series of calls were made from the codefendant's phone to the victim's phone — at 12:57 a.m., 1:04 a.m. and 1:22 a.m.[FN6] Those calls all connected through cell towers located in Schenectady. A few minutes after the last call, at 1:31 a.m., the vehicle reappeared on surveillance video. It retraced the route it had taken earlier, now heading away from the victim's neighborhood and driving back toward Lall's residence. It was last captured at 1:39 a.m. as it continued toward the highway.
The codefendant's then-girlfriend testified that in November 2016, the codefendant told her he had to go to New York for "business." When pressed, he told her this meant that he was going to kill somebody. She further testified that on November 16, 2016, at the codefendant's request, she picked up a $700 "[m]oney [g]ram" from a Walmart in Newport, Delaware, which she believed was going to be used by him to rent a car. The money gram had been sent from a Walmart in the Town of Rotterdam, Schenectady County, by an employee of Lall's, at Lall's request. The girlfriend was listed as the recipient of the money gram and she signed a receipt as part of the transaction. The corresponding customer's receipt was found in Lall's residence.
The codefendant's girlfriend further testified that when the codefendant left her residence in Delaware to go to New York, she saw him walk toward a red car. There was another person in the car but she was unable to tell who it was. She testified that she next saw the codefendant when he returned to her residence around 5:00 a.m. or 6:00 a.m. the next morning. At that time, the codefendant told her that he had "handled his job" and killed someone and was going to be paid $10,000 for the murder. The next day, she saw the codefendant take apart his gun and soak it in bleach. He later told her that he had gotten rid of it. When he returned from New York, the codefendant no longer had his phone, so at his request she reported it as stolen.
On cross-examination, it was elicited that the codefendant's girlfriend had received financial assistance from the District Attorney's office and was promised that she would not be charged with any crimes in connection with [*6]the investigation, in exchange for her truthful testimony. On redirect, she testified that before her first conversation with the police, she called the father of her child and spoke with him on the phone. That call was subsequently played for the jury. On it, she can be heard saying that she thought the police wanted to talk to her because the codefendant had been involved in a shooting.
Defendant's then-girlfriend also testified at trial. She confirmed that she owned a red sedan, to which defendant had access. She confirmed that her vehicle was the one shown in the surveillance videos. She testified that defendant told her that on the night of the murder he was at a dice game and people started shooting. When she pressed defendant for details, he told her, "[t]he less [you] know the better."
As part of the investigation, law enforcement officials were granted an eavesdropping warrant and were able to record conversations from several phones relevant to the investigation. Some of those calls were played for the jury. As is relevant here, the codefendant could be overheard asking "if they had any one of us, any picture of [us]." Defendant could also be overheard referencing a video of codefendant and him driving. Notably, on one call defendant could be heard saying that the "[m]otherf***er shot his a** as soon as he came out." Frequency reports were utilized at trial to show how often different phones were in contact with each other. Those reports demonstrated that there was frequent communication between the codefendant and Lall in the months leading up to the victim's death, but not between defendant and Lall.
Both defendant's and the codefendant's police interviews were played for the jury. The codefendant denied knowing of Schenectady or being in upstate New York, and he never admitted to participating in a homicide. Nevertheless, he did make self-incriminating statements, including: "You are correct that I was not the person who put this in motion"; "They [perhaps referring to photos, or witnesses] got me in the middle of this s***"; "[even if I identify others as involved,] I'm still going to jail, and then it's going to be my word against them"; "Even if I was to say I know this or I know that, I'm still going to jail"; "Even if I run my mouth I might end up dead anyway"; and "[20] years [in prison] is the same thing as the rest of my life." He also referred to 25 years of imprisonment. The detectives never told the codefendant before the interview concluded that they were investigating a homicide, nor suggested a number of years of imprisonment. For his part, defendant maintained throughout his police interview that he did not know what the police were asking him about and ultimately invoked his right to remain silent.
We turn first to the sufficiency of the evidence as to defendant's conviction for conspiracy in the second degree. Defendant's primary contention is that there was no evidence of an agreement between himself and the codefendant [*7]to kill the victim, nor evidence that he intended for the victim to be killed. While there was no direct evidence of an agreement or of defendant's intent, the circumstantial evidence introduced during the 13-day-long trial is substantial. The People presented evidence from which the jury could reasonably conclude that defendant agreed to help the codefendant murder the victim by, among other things: driving the codefendant from Wilmington to Schenectady, where they met with Lall shortly before the murder; after the meeting with Lall, driving the codefendant to the victim's apartment, where he witnessed the codefendant lure the victim outside and shoot him; and driving the codefendant away from the scene and back to Delaware immediately after the murder. An agreement to commit a crime may be proven by circumstantial evidence (see People v Augustine, 235 AD2d 915, 920 [3d Dept 1997], appeal dismissed 89 NY2d 1072 [1997], lv denied 89 NY2d 1088 [1997]) and "the intent to commit murder may be inferred from defendant's actions and surrounding circumstances" (People v Sweet, 200 AD3d 1315, 1318 [3d Dept 2021], lv denied 38 NY3d 930 [2022]). Viewed in the light most favorable to the People, we find the evidence of defendant's guilt of conspiracy in the second degree to be legally sufficient (see People v Agan, 207 AD3d at 862).
Similarly, defendant's convictions for criminal possession of a weapon are also supported by legally sufficient evidence. "Possession can be actual or constructive (see Penal Law § 10.00 [8]) and constructive possession can be established by either direct or circumstantial evidence" (People v Pinkney, 90 AD3d 1313, 1314 [3d Dept 2011] [citation omitted]). "Constructive possession occurs where a defendant exercised dominion and control over the [car] where the weapon was [located]" People v Worthington, 150 AD3d 1399, 1401 [3d Dept 2017] [internal quotation marks, brackets and citations omitted], lv denied 29 NY3d 1095 [2017]). The evidence here was sufficient for the jury to conclude that defendant knowingly transported a handgun from Wilmington to Schenectady for the purpose of using it to murder the victim. Viewing the evidence in the light most favorable to the People, we find that it was legally sufficient to support a finding that defendant was in constructive possession of the handgun. Moreover, there was legally sufficient evidence to support defendant's weapons convictions as an accomplice (see People v Young, 209 AD3d 1278, 1278-1279 [4th Dept 2022], lv denied 39 NY3d 988 [2022]; Matter of Tatiana N., 73 AD3d 186, 190-191 [1st Dept 2010]; People v Howard, 24 AD3d 798, 799 [2d Dept 2005], lv denied 6 NY3d 895 [2006]).
As to defendant's weight of the evidence argument, while a different verdict would not have been unreasonable — given that no DNA evidence linked defendant to the crimes, there were no eyewitnesses to the shooting and the murder weapon was not found — in deferring to the jury's factual determinations and credibility [*8]assessments, and viewing the substantial circumstantial evidence adduced at trial in a neutral light, we find that the weight of the evidence supports the verdict (see People v Pierre, 162 AD3d 1325, 1327 [3d Dept 2018], lv denied 32 NY3d 1007 [2018]; People v Rivera, 212 AD3d at 946-947; People v Agan, 207 AD3d at 862-863).
Regarding defendant's motion for a separate trial, we find no abuse of discretion in County Court's denial of that request. "Applications for severance are addressed to the trial court's sound discretion, which must weigh the public interest in avoiding duplicative, lengthy and expensive trials against the defendant's interest in being protected from an unfair advantage in favor of the People" (People v Durant, 205 AD3d 1067, 1069 [3d Dept 2022] [internal quotation marks and citations omitted]; see CPL 200.40 [1]). Where, as here, "proof against both defendants is supplied to a great extent by the same evidence, only the most cogent reasons warrant a severance" (People v Minor, 129 AD3d 1337, 1339 [3d Dept 2015] [internal quotation marks and citation omitted], lv denied 27 NY3d 1003 [2016]; accord People v Mahboubian, 74 NY2d 174, 183 [1989]). As County Court found, the proof against both defendants was supplied to a great extent by the same evidence. Although the proof against defendant was not quite as strong as the proof against the codefendant, "[t]hat the evidence against one of two or more jointly tried defendants may be stronger than the evidence against another hardly is unusual and does not afford the latter with an adequate ground for a severance" (People v Peisahkman, 29 AD3d 352, 353 [1st Dept 2006]; see People v Newton, 232 AD2d 429, 430 [2d Dept 1996], lv denied 89 NY2d 945 [1997]). While defendant relies on the statements made in the police video interview of the codefendant as a basis for severance, those statements did not implicate defendant. Thus, defendant's claim that the court abused its discretion in denying his motion for severance is without merit (see People v Murray, 155 AD3d 1106, 1108-1109 [3d Dept 2017], lv denied 31 NY3d 1015 [2018]).
We also reject defendant's hearsay argument, which was not preserved for our review as he failed to object to the challenged statements at trial (see People v Skeen, 139 AD3d 1179, 1182 [3d Dept 2016], lv denied 27 NY3d 1155 [2016]). Defendant's argument that his Sixth Amendment confrontation rights were violated by the admission of statements made by the codefendant during the police interview, without a limiting instruction, is also unpreserved (see People v Davis, 200 AD3d 1200, 1203 [3d Dept 2021]). In any event, during that interview the codefendant neither named defendant nor otherwise implicated him in any wrongdoing (see People v Maschio, 117 AD3d 1234, 1235 [3d Dept 2014]; People v Pagan, 87 AD3d 1181, 1184-1185 [3d Dept 2011], lv denied 18 NY3d 885 [2012]). Accordingly, defendant's rights under the Confrontation Clause were not violated.
Contrary to defendant's [*9]contention, County Court properly allowed the People to introduce evidence of the codefendant's girlfriend's phone call to her child's father to rebut defendant's claim of recent fabrication. During trial, defendant attacked the codefendant's girlfriend's credibility by questioning whether she received financial assistance from the District Attorney's office in exchange for her testimony. The phone call at issue, which predated that particular motive to falsify, was properly allowed to rebut the claim of recent fabrication (see People v Flowers, 83 AD3d 524, 524 [1st Dept 2011], lv denied 17 NY3d 795 [2011], cert denied 565 US 1017 [2011]). Moreover, "[i]n cases involving statements admitted pursuant to hearsay exceptions where the declarant has also testified in court, this Court has consistently not only permitted the use of the statements, but has also cited the declarant's presence on the witness stand as additional justification for the allowance because of the opportunity to verify and test the statements' trustworthiness" (People v Buie, 86 NY2d 501, 512 [1995]).
Defendant also contends that County Court committed reversible error by allowing the People to impeach defendant's girlfriend, their own witness, when she testified on direct examination that defendant did not tell her that he was present with the car in "[u]pstate New York" at the time of the murder, which contradicted her grand jury testimony. We disagree. "When, upon examination by the party who called him [or her], a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him [or her] or an oral statement under oath contradictory to such testimony" (CPL 60.35 [1]; see People v Wheeler, 203 AD3d 1330, 1334-1335 [3d Dept 2022], lv denied 38 NY3d 1075 [2022]). Such evidence may only be received for the purpose of impeaching credibility and, if introduced, the trial court must so instruct the jury (see CPL 60.35 [2]; People v Nunes, 168 AD3d 1187, 1190 [3d Dept 2019], lv denied 33 NY3d 979 [2019]). During the girlfriend's direct examination, the People asked her, "[D]id [defendant] ever tell you that he was with the car in [u]pstate New York?" to which she responded, "No." Over defendant's objection, the People were permitted to read the girlfriend's grand jury testimony in which she was asked if defendant "confirmed that he was up there with [the car]" to which she replied "Yes." County Court promptly gave an appropriate limiting instruction. Thus, we conclude County Court properly permitted the People to use this grand jury testimony for impeachment purposes (see People v Berry, 27 NY3d 10, 17-18 [2016]; People v Wheeler, 203 AD3d at 1335-1336).
Defendant next contends that the codefendant's girlfriend was an accomplice as a matter of law and that, therefore, County Court erred when it instructed [*10]the jury that her testimony only required corroboration if they first determined that she was an accomplice. "A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense" (CPL 60.22 [1]). To be an accomplice for corroboration purposes, the witness must be "implicated in, and possibly subject to, prosecution for the general conduct or factual transaction on trial" (People v Major, 143 AD3d 1155, 1157 [3d Dept 2016] [internal quotation marks and citations omitted], lv denied 28 NY3d 1147 [2017]; see People v Medeiros, 116 AD3d 1096, 1098 [3d Dept 2014], lv denied 24 NY3d 1045 [2014]). "Where the court determines on the evidence that a witness comes within the meaning of CPL 60.22 (2), the witness is an accomplice as a matter of law, and the court must instruct the jury that the witness is an accomplice and subject to the statutory corroboration requirement" (People v Sage, 23 NY3d 16, 23-24 [2014] [citations omitted]; accord People v Jones, 166 AD3d 1394, 1395 [3d Dept 2018], lv denied 33 NY3d 950 [2019]; People v Slaughter, 150 AD3d 1415, 1416 [3d Dept 2017]). However, "[i]n a case where the court concludes that a factual dispute exists as to whether the witness is an accomplice under the statute, the factual question is left for the jury to resolve" (People v Sage, 23 NY3d at 24; accord People v Jones, 166 AD3d at 1395; People v Slaughter, 150 AD3d at 1416). The codefendant's girlfriend's involvement in the case largely consisted of picking up the money gram at Walmart and reporting the codefendant's phone as stolen when he returned from upstate New York. Although she seemed aware that the codefendant was going to New York to kill somebody, she appeared to be unaware of the specific details and was not directly involved in the plan. During the charge conference, County Court acknowledged that both defendant and the codefendant were requesting a charge instructing the jury to consider the codefendant's girlfriend as an accomplice as a matter of law. County Court denied defendant's request "based upon the totality of the evidence" and instead stated its intent to read the accomplice as a matter of fact instruction; the court instructed the jury in line with that ruling.
We find that a factual question exists as to whether the codefendant's girlfriend could have been implicated in or subject to prosecution for crimes related to the victim's murder. This is the exact sort of situation to which an accomplice in fact charge applies. Thus, County Court did not err when it instructed the jury that it was for them to determine, as a question of fact, whether the codefendant's girlfriend acted as an accomplice (see People v Jones, 166 AD3d at 1396; People v Slaughter, 150 AD3d at 1416).
As for defendant's challenge to the sentence, we are unpersuaded that it is unduly harsh or severe (CPL 470.15 [6] [b]; see People v Burton, 215 [*11]AD3d 1054, 1064 [3d Dept 2023] lv denied 40 NY3d 927 [2023]; People v Winter, 215 AD3d 1010, 1012-1013 [3d Dept 2023]). However, as defendant contends and the People concede, the sentences for the weapon possession convictions (counts 3 and 4) may not run consecutively with the murder and conspiracy convictions (counts 1 and 2) (see People v Graham, 215 AD3d 998, 1009 [3d Dept 2023], lv denied 40 NY3d 928 [2023]; People v Jackson, 226 AD2d 476, 477 [2d Dept 1996], lv denied 88 NY2d 987 [1996]). As such, the sentences imposed on counts 3 and 4 are modified to run concurrently with the sentences imposed on counts 1 and 2, which result in an aggregate prison sentence of 25 years to life.
Finally, defendant argues that County Court erred by denying his CPL 440.10 motion to vacate his judgment of his conviction due to ineffective assistance of counsel. His motion set forth five alleged failings by his trial attorney as the basis for that claim — namely, that counsel failed to (1) elicit testimony from the codefendant's girlfriend that the codefendant told her his "bro" was not with him at the time of the murder; (2) object to the admission of the codefendant's hearsay statements; (3) request a charge instructing the jury not to consider the codefendant's police interview; (4) request limiting instructions regarding a mention of defendant's previous incarceration and his invocation of his right to remain silent during his police interview; and (5) cite to a police affidavit in the process of seeking to admit photos of a white sedan near the crime scene at the time of the shooting. As these contentions raise both record-based and nonrecord-based allegations of ineffectiveness, they will be addressed together, in their entirety, in the context of defendant's appeal from the denial of his CPL 440.10 motion (see People v Taylor, 156 AD3d 86, 91-92 [3d Dept 2017], lv denied 30 NY3d 1120 [2018]; see also People v Thacker, 173 AD3d 1360, 1361 n 2 [3d Dept 2019], lv denied 34 NY3d 938 [2019]).
"To establish a claim of ineffective assistance of counsel, a defendant is required to demonstrate that he or she was not provided meaningful representation and that there is an absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Reichel, 211 AD3d 1090, 1091 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1113 [2023]). "A claim will fail so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Calafell, 211 AD3d 1114, 1120 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1077 [2023]).
Here, defense counsel not making certain objections or requesting various limiting instructions, as well as not citing to the affidavit regarding the white car, could well have been prompted by strategic explanations[*12](see People v Podeswa, 205 AD3d 1139, 1141-1142 [3d Dept 2022], lv denied 38 NY3d 1135 [2022]; People v Stanton, 200 AD3d 1307, 1310-1311 [3d Dept 2021], lv denied 38 NY3d 954 [2022]). Thus, County Court properly denied defendant's motion without a hearing. Contrary to defendant's contention, counsel's decision not to question the codefendant's girlfriend about the codefendant telling her that his "bro" was not with him at the time of the murder, but was elsewhere in Schenectady, did not amount to ineffective assistance of counsel. Eliciting such a statement would have run directly counter to defendant's position at trial, which was that he was not in upstate New York at all on the night of the murder. Defendant has also failed to demonstrate the absence of a strategic explanation for his counsel not objecting to the admission of the codefendant's hearsay statements. It is possible that defense counsel believed that objecting to those statements would draw the jury's attention to them further. Moreover, defendant acknowledges that the codefendant's statements did not incriminate him, either directly or inferentially. Likewise, we find no error on defense counsel's part in not requesting a limiting instruction regarding the codefendant's police interview, as this too could have been the result of a strategy designed to not draw the jury's attention toward unfavorable evidence. Further, reference to defendant's criminal history was the subject of an appropriate limiting instruction to the jury (see People v Walker, 80 AD3d 793, 794-795 [3d Dept 2011]; People v Lownes, 40 AD3d 1269, 1270 [3d Dept 2007], lv denied 9 NY3d 878 [2007]). Lastly, counsel's failure to cite to the affidavit in support of offering the photographs of the white car was likely the result of the extensive cross-examination that had already occurred on the subject. When viewed in its totality, the representation provided to defendant was certainly skilled, zealous and meaningful, and County Court properly denied defendant's CPL 440.10 motion.
To the extent that defendant's remaining claims are not specifically addressed herein, they have been considered and found to be without merit.
Lynch, J.P., Clark, Ceresia and Fisher, JJ., concur.
ORDERED that the judgment is modified, on the law, by directing that defendant's sentences shall all run concurrently with one another; matter remitted to the County Court of Schenectady County for entry of an amended uniform sentence and commitment form; and, as so modified, affirmed.
ORDERED that the order is affirmed.

Footnotes

Footnote 1:Prior to trial, Lall and defendant moved to be tried separately. County Court granted Lall's motion and denied defendant's motion, so defendant and the codefendant were tried together. The codefendant was convicted of all charges.

Footnote 2:Defendant's challenge to the legal sufficiency of the murder charge is unpreserved for our review as defendant did not make specific arguments regarding the murder charge in his motion for a trial order of dismissal (see People v Agan, 207 AD3d 861, 863 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]). Nevertheless, in the course of reviewing defendant's challenge that the verdict as to all counts is against the weight of the evidence, we "necessarily evaluate whether all elements of the charged crimes were proven beyond a reasonable doubt" (People v McCoy, 169 AD3d 1260, 1261 [3d Dept 2019], lv denied 33 NY3d 1033 [2019]).

Footnote 3:

Footnote 4:

Footnote 5:Although both of these cell phone numbers came back as registered to "John Doe," they were connected to defendant and the codefendant through the federal probation database.

Footnote 6: